CRSS INC. and CRSS+Metcalf & Eddy
Joint Venture, Appellants,

v.

Riziero F. MONTANARI, Appellee.

No. 01–92–00893–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

April 27, 1995.

Rehearing Overruled June 1, 1995.

Steve Rosenblatt, Angela C. Mogan, Houston, for appellants.

Gregory M. Cokinos, William F. Stephens, Jr., Kevin Dubose, Houston, for appellee.

Before DUGGAN *, O'CONNOR and HEDGES, JJ.

## OPINION ON MOTION
## FOR REHEARING

O'CONNOR, Justice.

In March 1990, Riziero F. Montanari sued CRSS, Inc. and CRSS+Metcalf & Eddy Joint Venture (collectively, CRSS) for breach of an employment contract, and for various related causes of action in tort. In March 1992, the trial court granted Montanari's motion for sanctions, struck CRSS's pleadings, and entered an interlocutory default judgment. The next month, after a six-day jury trial limited to damages, the jury returned a verdict in favor of Montanari for approximately $5.9 million, including $486,000 in actual damages for breach of contract, $817,000 in actual tort damages, and $4,050,000 in punitive damages.

CRSS appeals, bringing 10 points of error, contending that the trial court erred in striking its pleadings as a discovery sanction (point one), committed various trial errors in the ensuing damages trial (points two through four), erred in the recovery it awarded Montanari on his tort claims and claim for attorneys' fees (points five through nine), and erred in refusing to allow CRSS to file a complete bill of exceptions (point 10). The panel overrules the motions for rehearing, withdraws its previous opinion, and substitutes the following opinion. As on original submission, we reverse and remand. The full court overrules the motion for rehearing en banc.

### Facts

In 1987, Montanari and CRSS entered into a contract for Montanari's employment as a construction engineer for CRSS in connection with its work on the Peace Shield program of the United States Air Force. The program called for the Air Force to build an air defense system in and for Saudi Arabia, consisting of 17 remote radar sites and five central command centers. Under its contract with the Air Force, CRSS's role was to provide the requisite construction engineering, design and management services for the program.

Montanari began his work in Saudi Arabia in November 1987. In May 1988, his job title changed to "senior inspector." In September 1988, Montanari was arrested by Saudi Arabian police for possession of alcohol, proscribed by Saudi law. He remained in custody for approximately two months. While in custody, Montanari made an oral confession to possession of two bottles of beer, and signed a written confession (in Arabic), admitting to various crimes.

Under his employment contract, CRSS had the right to terminate Montanari for cause for violating the laws or regulations of Saudi Arabia. Upon his release from prison, however, CRSS allowed Montanari to complete the two-year term of his written contract. CRSS did not renew Montanari's contract after the two year term, even though, according to Montanari, he had been told when he was recruited that he could expect to be a "permanent [CRSS] employee for at least ten years."

Montanari's term with CRSS ended in November 1989, and he filed this suit on March 22, 1990. In his suit Montanari made the following claims: (1) CRSS did not give him the opportunity to work overtime, as it said it would; (2) CRSS did not pay him for overtime work he had actually performed; (3) CRSS misrepresented the vacation time he had available; (4) CRSS did not pay him the

---

* Justice Duggan, who retired December 31, 1994, continues to sit by assignment for the disposition of this case, which was submitted before that date.

extra compensation due when he became a senior inspector; and (5) CRSS encouraged and assisted him and other employees in the preparation of alcoholic beverages, which is illegal in Saudi Arabia, for which Montanari was imprisoned. The case was initially assigned to Judge Russell Lloyd, in the 334th district court.

### The discovery

Discovery disputes marred the entire lawsuit. As far as this record reveals, the parties were not able to agree on any discovery matter.

On May 24, 1990, Montanari noticed the deposition of Gary Anderson, an employee of CRSS, for June 5, in Houston, and CRSS noticed Montanari's deposition. On June 4, CRSS filed a motion for protection and asked, *inter alia,* that Anderson's deposition notice be quashed because Anderson was in Saudi Arabia working for one of the defendants, but would be available for deposition in Chicago, Illinois, at the end of June.[1] On June 6, Montanari filed a motion to quash the notice of his own deposition, and for protective order, as well as a response to CRSS's motion for protection.

On June 6, 1990, less than three months after the suit was filed, Montanari filed the first of his numerous "emergency" motions for sanctions, asking the court to strike defendant's pleadings and enter judgment in his favor. In this motion, Montanari said he had obtained information that Anderson would not be an employee of CRSS beginning June 7, 1990. Montanari's complaint was, in essence, that CRSS had been slow to respond to his attempts to confirm that information. The emergency motion went on to say,

> Defendants and their counsel have refused to cooperate in regard to obtaining the testimony of this important witness and are attempting to stall the deposition until such time as Mr. Anderson is no longer an employee of defendant and no longer in its custody and control as provid-

ed in Rule 201(3) of the Texas Rules of Civil Procedure. As such, plaintiff could be required to track down Mr. Anderson anywhere in the world. Defendants' acts constitute clear abuse of the discovery process in intentionally failing to respond to plaintiff's inquiries relative to the continued employment of Mr. Anderson and his whereabouts, and agreeing to produce him for a deposition, which evidences bad faith on the part of defendant to suppress discovery in this matter. Such abuse of the discovery process is clearly a violation of rule 215 of the Texas Rules of Civil Procedure in defendants' attempt to reset discovery. Plaintiff moves to strike defendants' pleadings in this cause and for entry of judgment against defendants and in favor of plaintiff, and for sanctions against defendants. Alternatively, plaintiff moves that the court prohibit Gary Anderson from testifying as a witness in this cause of action.... Alternatively, plaintiff moves the court to compel defendants to produce Mr. Anderson at plaintiff's counsel's office for deposition at defendants' cost and expense and at such time and date as reasonably agreeable with plaintiff and his counsel.

The court heard the emergency motion on June 7, 1990, and on July 2, the trial court signed its "order relative to conducting depositions in Saudi Arabia." The trial court ordered the defendants to cooperate with plaintiff's counsel in arranging in Saudi Arabia the depositions of individuals then present there, including Montanari himself; ordered both parties to share equally in the travel expenses; and ordered that Anderson's deposition be taken either in Houston or in Chicago at a mutually agreeable date and time, on or before July 20, 1990. *The trial court did not find, in the July 2, 1990, order, that CRSS engaged in any sanctionable conduct.*

Discovery proceeded. The parties served each other with interrogatories and requests for production, and depositions began.

---

1. Generally, CRSS's counsel preferred that deponents employed by CRSS in Saudi Arabia be deposed on their next trip back to the United States, at their respective U.S. destinations.

Montanari's counsel preferred instead to schedule a one- to two-week period for conducting depositions in Saudi Arabia of all parties and non-party deponents.

Meanwhile, the case was set for trial for the week of April 6, 1992.

On July 30, 1990, Montanari served interrogatories and a request for production of documents on CRSS. Interrogatory number two of that set asked CRSS to "[i]dentify all persons with knowledge of information relevant to the subject matter of this lawsuit." The requests for production germane here are included in the footnote.[2]

On May 2, 1991, Montanari filed another "emergency" motion to compel discovery and for sanctions. Montanari complained that CRSS did not comply with the trial court's July 2, 1990, "order relative to conducting depositions in Saudi Arabia," requiring CRSS to cooperate with Montanari's counsel in arranging depositions in Saudi Arabia of individuals present there. In Montanari's words,

> The first of [plaintiff's repeated requests] was to schedule the depositions during the last week in July and first week in August 1990. Defendants' counsel would not schedule the depositions ... on such dates. After a number of attempts to schedule the depositions without success, defendants used the seizing of Kuwait by Saddam Hussein as an excuse for refusing to consider scheduling of depositions in accordance with the court's order. Although the towns in Saudi Arabia were not affected by this takeover, defendants did not cooperate and schedule any depositions, and continued to refuse to do so until the Kuwait matter was resolved.... Later, defendants' counsel pledged that as soon as the conflict was resolved in Kuwait, he would arrange the depositions of all persons previously requested by plaintiff in Saudi Arabia.

> The war in the Middle East ended in early February 1991. [Plaintiff's] counsel contacted defendants to arrange the depositions in Saudi Arabia. Defendants' counsel, although having represented that he would get back with plaintiff's counsel relative to scheduling the depositions, failed to do so. Plaintiff's counsel continued to call on numerous occasions.... Defendants' counsel has refused and, to this date, continues to refuse to honor the court's order, which is approaching its first anniversary.

Montanari went on to say that he believed that the end of the Peace Shield program was imminent and that CRSS was trying to delay the depositions until after the prospective deponents dispersed to their homes, located all over the world; and that CRSS refused to keep him informed of the location of its employees and other witnesses. In his prayer for relief, Montanari asked the court to require CRSS to arrange for the depositions, to pay Montanari's expenses for obtaining the deposition testimony of any witness who left Saudi Arabia by June 7, 1990, and to strike CRSS's pleadings and enter a default judgment against CRSS on liability.

The May 2, 1991, emergency motion was heard on May 10, and, on June 8, 1991, the court signed an order in which it found that

---

2. The request for production asked for, *inter alia*,

3. Copies of each and every statement, whether oral or written, of the defendants, its agents, servants, and employees relative to the subject matter of this lawsuit.

5. All records reflecting approval of overtime by defendant on construction projects in which defendants have been or are employed in the kingdom of Saudi Arabia or related to the Peace Shield Program for the time period beginning the first day of January 1987, through the present time.

11. All job descriptions maintained by defendants for personnel located in Saudi Arabia working on the Peace Shield program and/or the joint venture[.]

15. Any and all documents and tangible things relating to communications between the defendants and any party to this lawsuit or any witness with knowledge of matters relevant to the subject matter of this lawsuit and statements by either defendants, or its agents or representatives concerning matters which are the subject of this cause of action.

18. All documents connected with information concerning overtime performed by employees supervised by Gary F. Anderson and/or Lynn F. Wilcox in Saudi Arabia during the years beginning January 1986 through this date, including any and all documents evidencing the overtime policy for defendants and employees working on the Peace Shield program in Saudi Arabia during such period and documents evidencing approval of overtime for such employees.

27. All policies of insurance, including declaration pages, whereby any insurance company may be liable to satisfy all or any part of a judgment which might be entered in this cause.

CRSS had refused to comply with the court's July 2, 1990, order. The court ordered CRSS to arrange for the orderly and continuous depositions of the prospective deponents on or before August 15, 1991, on terms the court proceeded to set forth. Concerning the request for sanctions, the court said:

It is further ORDERED that if defendants fail to produce its named employees, representatives and agents in Saudi Arabia for plaintiff's depositions, or if defendants refuse to allow completion of the depositions of such employees, representatives and agents, or otherwise fail to comply with the court's [previous order], or this order, then defendants' pleadings *may be* [3] stricken and judgment entered in favor of plaintiff for all liability alleged in this cause of action against defendants without need of further order by this court[.]

(Emphasis added.) *The trial court found that CRSS had engaged in sanctionable conduct—i.e., its refusal to comply with the court's "order relative to conducting depositions in Saudi Arabia." The trial court warned that CRSS's pleadings might be stricken in the future, but did not impose sanctions on CRSS for that conduct.*

On June 28, 1991, Montanari asked for a hearing on CRSS's objections to his interrogatories and request for production, and CRSS's objections to his subpoena duces tecum concerning the deposition of Phil Sykes.[4] The hearing was set for July 1, 1991. On July 24, 1991, the court signed an order overruling some of Montanari's objections and sustaining others. The form order provided by Montanari included a blank for the award of attorneys fees as a sanction. The trial court crossed out that paragraph, and declined to award any attorney fees or sanc-

tions. On this occasion, *the trial court did not find CRSS engaged in any sanctionable conduct.*

After the July 24 order, CRSS produced documents responsive to Montanari's requests in a designated restricted-access room (the document room) at CRSS's office, used exclusively for segregating documents produced in this case. In July 1991, Montanari's attorney, with the help of three employees, marked each document in the room with a Bates stamp number.

On July 9, 1991, Montanari filed a motion to quash the oral deposition of Lynn Wilcox. The court granted that motion, in an order signed July 9, 1991. Montanari submitted an order which contained a blank for attorneys' fees payments "as sanctions against defendants for intentionally noticing the deposition at a time when it knew plaintiff's counsel was unavailable." The court refused to award any attorney fees or sanctions.

On July 30, 1991, Judge Russell Lloyd recused himself from hearing further proceedings in the case. On August 1, the case was assigned to Judge Eugene Chambers, in the 215th district court.

On February 21, 1992, Montanari filed a motion for sanctions, seeking $1,817.78 in expenses and attorneys' fees of $1,000 due to alleged bad faith in efforts to mediate the case. The motion did not include a request to strike pleadings. The motion was set for hearing on February 24, 1992. The record before us does not include an order from the hearing on February 24, 1992. Thus, *we have no record that the trial court, at that hearing, made any finding of sanctionable conduct.*

---

3. Montanari's draft order read "shall be stricken"; the trial court crossed out "shall be" and inserted "may be."

4. The subpoena duces tecum to Sykes requested, *inter alia,*

 3. All records reflecting approval of overtime by defendant on construction projects in which defendants have been or are employed in the Kingdom of Saudi Arabia or related to the Peace Shield Program for the time period beginning the 1st day of January 1987, through the present date [June 28, 1991].

 4. All records and documents reflecting overtime requests by any employees of defendants, including defendant Phil Sykes, since the 1st day of January 1987, through the present date.

 12. Any and all documents evidencing proposals, agreements, or contracts between the U.S. Air Force and either defendant, including any drafts thereof, or amendments or modifications thereto, concerning the Peace Shield program in Saudi Arabia.

On February 14, 1992, CRSS filed its second amended answer, to which Montanari specially excepted. In the same instrument, Montanari also "move[d] [the court] to order [CRSS] to replead and support [its] allegations factually so that plaintiff may be fully apprised of the defendant[s'] allegations against him." The special exceptions were set for consideration by the trial court on written submission, on March 9, 1992. On March 23, Montanari filed a motion asking the court to strike CRSS's pleadings "for failing to comply with the court order of March 9, 1992," and set a March 25 hearing on the motion. *The record includes no such underlying order, either granting the special exceptions or compelling CRSS to amend its answer, to support the sanctions Montanari was asking the trial court to impose.*

On March 24, 1992, the day before the hearing, CRSS filed its third amended answer.[5] Also on March 24, Montanari took the deposition of Leslie Forrestier, a contract administrator for CRSS, in its Houston office. The subpoena duces tecum for the deposition requested, *inter alia,*

5. All policies of insurance, including declaration pages, whereby any insurance company may be liable to satisfy all or any part of a judgment which might be entered in this matter.

6. Any and all booklets or documents in the possession of the defendant giving cost breakdown proposals showing the base remuneration plus overtime projected for positions within the joint venture.

7. All audit letters for the years 1986–1992.[6]

On March 25, 1992, Montanari filed a supplemental motion to strike CRSS's pleadings, adding a second, independent ground for sanctions—namely, that CRSS had allegedly engaged in egregious and flagrant discovery abuse. Montanari asserted that 10 binders full of documents were knowingly and willfully withheld from him; they were not tendered, nor their existence disclosed, he said, until March 24, 1992, during Forrestier's deposition.

Montanari also filed a motion for leave to shorten the time for hearing on the supplemental motion to strike CRSS's pleadings, and asked that the supplemental motion be heard at the March 25 hearing, scheduled for the hearing of his original motion to strike. That day, the trial court reset the hearing to Saturday, March 28, 1992, to allow CRSS to file its response to Montanari's supplemental motion to strike its pleadings, on March 26. In that response, CRSS stated that Montanari's counsel inspected the 10 binders at the CRSS office on July 29, 1991.

On March 27, 1992, the day before the hearing on the motion to strike, two important things happened. First, Montanari filed a supplemental petition that alleged he was a third-party beneficiary of the contract between CRSS and the United States Air Force, asked for damages for breach of that contract, added a number of additional affirmative defenses, and included additional special exceptions to CRSS's answer. Second, Montanari claimed his lawyer found 15 additional boxes of documents in the document room. None of the additional documents in the room bore the Bates stamp that he had applied to the documents when he first reviewed the documents.

### The hearing on sanctions

At the Saturday hearing, Montanari elaborated upon his allegations of discovery abuses, saying that the particular abuses were:

10. Any and all audit letters, audit response letters, or similar communications or correspondence from defendants or their attorneys, agents, or other representatives to defendants' accountant(s), certified public accounting firms(s), or bookkeepers concerning, relating to, evaluating, or otherwise discussing pending or threatened claims, demands, or litigation against either defendant for the year 1986, 1987, 1988, 1989, 1990, 1991, and 1992.

---

5. The answer and accompanying transmittal include evidence that the deadline for CRSS to amend its second amended answer in response to the court's sustaining Montanari's special exceptions was miscommunicated or not communicated to CRSS.

6. Before the deposition was taken, Montanari amended the subpoena duces tecum to add a request for

(1) Failure to identify Leslie Forrestier and Rogers Patton[7] as persons with knowledge of relevant facts concerning overtime;

(2) Failure to produce a set of 10 binders of proposals and contracts on which Leslie Forrestier made hand-written notes during negotiations over the entire project with the USAF, until her deposition;[8]

(3) Adding 15 to 20 boxes of documents to the document room maintained for Montanari's access to [CRSS] document production, after the initial visit by Montanari's trial counsel, without notifying Montanari's counsel, and then misleading Montanari's counsel with a March 24, 1992, letter from CRSS's lawyers, which said, with respect to 15 of 22 individual requests for production mentioned, that everything responsive to Montanari's discovery requests was produced in the document room in July 1991. Included in the added boxes were the following documents, about which Montanari made specific complaint:

(a) May 29, 1990 electronic mail letters between [CRSS] employees regarding fellow employee Chris Henry's[9] requested changes in his prospective no-objection letter;[10]

(b) May 23, 1990, memo between [CRSS] employees including a request to "[c]onfirm Chris Henry is clear to be paid off";[11]

(c) May 4, 1989 memo between [CRSS] employees about Montanari's and four other subordinates' confusion regarding [CRSS] vacation policy, criticizing management's explanation of the policy, and stating that the confusion "can't be coincidental";

(d) An insurance policy covering CRSS for liquor law liability from July 1, 1987, to July 1, 1988;[12]

(e) An audit letter from CRSS's lawyers to CRSS's accountants, (i) estimating the possibility of a verdict for Montanari in this suit as 30 to 40 percent; (ii) estimating the range of possible verdicts as a high of $1–$1.5 million; (iii) speaking of the possibility that a recovery might lead Montanari's lawyer to solicit other [CRSS] employees to bring similar suits; and (iv) observing, with respect to other such possible suits, that "the statute of limitations may bar such claims by the time this case is finally resolved"; and

(f) Job descriptions for eleven project positions, including construction engineer and senior inspector, that allegedly were not tendered until Leslie Forrestier's deposition.

At the hearing, Montanari presented testimony from his counsel and from CRSS employees. Counsel for Montanari testified that he and his staff stamped every document in the document room with a Bates

---

7. The program director for CRSS, Truitt Garrison, testified at the sanctions hearing that Rogers Patton was a controller on the project, and "had possession of original documents regarding overtime budget projections."

8. After those negotiations, Forrestier stored the 10 binders in her office.

9. Chris Henry had been Montanari's roommate for part of his time in Saudi Arabia, and had knowledge concerning Montanari's arrest and incarceration and the subsequent efforts to secure his release.

10. There was evidence that, as a condition to allowing a foreigner who has already worked in Saudi Arabia to work there again for a new employer within a specified number of years of the prior employment, the Saudi government requires a letter from the prior employer stating that it has no objection to his working for the new employer in Saudi Arabia.

11. There was undisputed testimony at the sanctions hearing from James Doyle, administration manager for CRSS, that, at the end of their service with CRSS, all joint venture employees received a final payment, colloquially called a "payoff."

12. A substantial question exists whether that particular policy was within the scope of Montanari's request for policies that might make a company liable to satisfy all or any part of a judgment in this case; the policy in question defined the "policy territory" as:

(1) the United States of America, its territories or possessions, or Canada, or (2) international waters or air space . . . , or (3) anywhere in the world with respect to damages because of bodily injury or property damage arising out of a product which was sold for use or consumption within the territory described in paragraph (1) above[.]

stamp in July of 1991. Counsel for Montanari admitted that after inspecting the documents in 1991, neither he nor his staff went to the document room again until March 27, 1992, the day before the hearing. On that day, he found 10 or 20 additional boxes full of unstamped documents in the room. Janice Scanlan, a paralegal for CRSS's counsel, testified that "in the last days we produced supplemental things to you that weren't in that room [in July 1991]."

Montanari's counsel also testified that CRSS did not produce the 10 binders containing proposals until he took Forrestier's deposition. Scanlan contradicted his testimony, and said she had showed him eight to 10 binders that contained the proposals, in 1991. Mr. Sperandio, the deputy program director for CRSS, testified that Montanari's counsel inspected the master set of proposals contained in the three-ring binders. He said the binders in Forrestier's office were duplicates of the master set. He acknowledged that the master set did not have the handwritten notes included in Forrestier's office set.

At the end of the hearing, the trial court orally granted Montanari's motion to strike CRSS's pleadings. On March 30, 1992, the following Monday, the court signed its written order embodying that ruling. The case was tried to the jury on damages only, beginning on April 8, 1992, resulting in the adverse judgment from which CRSS appeals.[13]

### Error in striking the answer

In point of error one, CRSS contends that the trial court erred in striking its pleadings as a discovery sanction and in failing to set aside the interlocutory default judgment on liability.

 A trial court may impose sanctions on a party under Tex.R.Civ.P. 215 for abuse of the discovery process. *Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex. 1986). The imposition of discovery sanctions is within the trial court's discretion, and will be set aside only if it clearly abused its discretion. *Id.; Bair v. Hagans*, 838 S.W.2d 677, 681 (Tex.App.—Houston [1st Dist.] 1992, writ denied). A trial court abuses its discretion by imposing sanctions if the sanctions do not further one of the purposes of such sanctions. The purposes of discovery sanctions are (1) to secure compliance with discovery rules; (2) to deter other litigants from similar misconduct; and (3) to punish violators. *Bodnow*, 721 S.W.2d at 840.

### Failure to identify Forrestier & Patton

Montanari complained to the trial court that CRSS did not identify Leslie Forrestier and Rogers Patton as persons with knowledge of relevant facts and with custody of documents regarding overtime. CRSS's position is that, while overtime was an issue in the suit, Forrestier's and Patton's particular knowledge and records about overtime was not "relevant" to Montanari's claims; accordingly, neither Forrestier nor Patton were listed in response to requests concerning persons with knowledge of relevant facts. CRSS reasons that Forrestier's and Patton's knowledge and records related to overtime budgeting projections for the entire project, for multi-year periods and for multiple sites, which were part of the process of negotiations with the Air Force about overtime, and that such projections would not be probative of the overtime that would be available to any individual employee moved from site to site over his contract term in response to the actual, rather than projected, needs of CRSS.[14]

Montanari's interrogatory number two asked CRSS to identify all persons with knowledge of information relevant to "the subject matter of this lawsuit." In response to this interrogatory, CRSS initially identified 27 persons. By supplemental answer filed on August 22, 1991, CRSS identified 41

---

13. Judge Chambers orally granted CRSS's motion for new trial in open court, reducing the sanction to $75,000. By the time he signed a written order seven days later, however, he had changed his mind, and he denied CRSS's motion for new trial.

14. The notes do contain, however, what CRSS's deputy program director characterized, at the sanctions hearing, as a projected weekly breakdown of available overtime by "sectors of the Kingdom."

persons, stating the substance of the facts each person knew.

At the time CRSS filed the supplemental answers to interrogatories (August 22, 1991), Montanari's petition did not contain any allegation that would have put CRSS on notice that either Forrestier or Patton had any relevant knowledge about the lawsuit.[15] It was only after Montanari amended his pleadings to allege that he was a third-party beneficiary of the contract between CRSS and the Air Force (March 27, 1992), that his pleadings put CRSS on notice that Forrestier or Patton might have had some knowledge that was relevant to the lawsuit. Thus, the late addition of the issue was good cause for late designation of witnesses. *See In re Thurmond,* 888 S.W.2d 269, 274 (Tex.App.—Amarillo 1994, writ denied) (defendant raised issue of separate property for first time in his second amended original answer, which was good cause for late designation of witnesses).

If Montanari had filed a request for the identity of persons with information about specific matters (*e.g.,* all persons who had any information about contracts CRSS had with other entities regarding the overtime), CRSS might have been put on notice that Forrestier and Patton had information that would require them to be identified as witnesses. Montanari's general interrogatory request for all persons who had knowledge about the lawsuit, coupled with his petition that did not claim a cause of action related to the Air Force contracts, did not alert CRSS that Forrestier and Patton were persons with relevant knowledge.

■ Generally, the court should not strike a party's pleading for failure to timely designate a witness. *Remington Arms Co. v. Caldwell,* 850 S.W.2d 167, 171 (Tex.1993). A sanction that terminates the lawsuit should be used only when the sanctioned party's conduct justifies the presumption that its claims or defenses lack merit. *Id.* When a party fails to timely designate a witness before trial, the court can exclude or limit the

evidence. *See id.* (death penalty sanction inappropriate; exclusion of ballistics testimony was sufficient sanction). When a party fails to produce evidence and the evidence is detrimental to its case or favors the party that requested it, the appropriate sanction is not to exclude it; rather, the appropriate sanction is to limit the offending party's evidence on the same issue. *City of San Antonio v. Fulcher,* 749 S.W.2d 217, 219 (Tex. App.—San Antonio 1988, writ denied).

■ Once the trial court found that CRSS should have disclosed the witnesses, the trial court could have crafted a sanction that prevented CRSS from benefiting from the testimony. The court could have prevented CRSS from offering the witnesses. If the witnesses were offered by Montanari, the court could have prohibited CRSS from cross-examining them.

We hold the trial court abused its discretion in striking CRSS's pleadings as a discovery sanction for failing to identify Forrestier and Patton in response to interrogatory number two.

### Failure to produce the 10 binders full of proposals

■ Montanari complained to the trial court that CRSS knowingly and willfully withheld 10 binders full of documents from him. Montanari contends CRSS did not tender or disclose the existence of the binders until March 24, 1992, during Forrestier's deposition.

Production of the binders was required in response to a subpoena duces tecum issued to Sykes. Montanari's subpoena duces tecum to Sykes asked for

12. Any and all documents evidencing proposals, agreements, or contracts between the U.S. Air Force and either defendant, including any drafts thereof, or amendments or modifications thereto, concerning the Peace Shield program in Saudi Arabia.

---

**15.** At the sanctions hearing, CRSS's attorney told the court that by the global request for witnesses with knowledge about "the subject matter of this lawsuit," CRSS did note that Forrestier or Patton should have been included. The trial court implicitly recognized the problem when it suggested CRSS should have listed every employee of the company.

CRSS filed objections to the subpoena, and on July 24, 1991, the trial court signed an order overruling the objections. By that order, CRSS was required to produce at Sykes' deposition all proposals, agreements, or contracts, including drafts, between the U.S. Air Force and CRSS.[16]

At the hearing on sanctions, two witnesses for CRSS testified that the master binders with the proposals were produced and shown to Montanari's counsel in July of 1991. Counsel for Montanari, by his cross-examination, made the point that the copies he was shown did not contain Forrestier's handwritten notes that he contended showed CRSS' positions with the Air Force in negotiation with regard to overtime and were therefore relevant to his claim that CRSS did not give him the opportunity to work overtime, as it said it would. On this record, it was an abuse of discretion to strike CRSS's pleadings for not having produced the binders. Forrestier's handwritten notes are a separate issue.

### Failure to produce Forrestier's notes

Montanari complained to the trial court that CRSS did not produce Forrestier's notes regarding contracts with the Air Force. The notes he refers to are handwritten notes appearing only on the proposals and contracts in the 10 binders located in her office. Scanlan, who testified she showed the proposals to Montanari's counsel in July 1991, admitted that she did not show him Forrestier's notes about those proposals.

CRSS asserts that Forrestier's notes are not "proposals, agreements, contracts . . . or a draft of any [of those three types of documents]," and, in turn, concludes that those notes do not fall within the terms of the subpoena duces tecum to Sykes. The subpoena, however, asked for *documents evidencing* such proposals, agreements, or contracts, *inter alia.* See n. 4, *supra.* Forrestier testified her notes "contain references to

overtime in our proposal." Accordingly, Forrestier's handwritten notes are, to some extent, probative of the content of CRSS's proposal, and therefore constitute, to the extent of that relationship, "documents evidencing proposals, agreements, or contracts" between CRSS and the Air Force. The ultimate discovery sanction of default should rest on a firmer foundation than that, and not hang on so middling an evidentiary connection. We hold the trial court could not impose the ultimate sanction for failure to produce Forrestier's notes. Other sanctions would have been more appropriate.

### Additions to the document room

Montanari complained to the trial court that CRSS put additional documents in the document room after his initial visit, without telling him. Montanari discovered the additional documents in the document room on Friday, the day before the Saturday hearing. Montanari's counsel inspected the documents in the document room on July 29, 1991 and Bates-stamped every document in the room. After that visit, neither he nor his staff asked to visit the document room again until March 27, 1992, the day before the hearing. On that visit, Montarani's counsel found documents that were not Bates-stamped.

At the hearing, Montanari called James Doyle, administration manager for CRSS, to testify. Doyle testified that he was present at a meeting in October 1991, when Forrestier told one of the CRSS lawyers that she had other documents that might be responsive to discovery. Doyle testified there were only two keys to the room, and he had one of them. He said he did not know when the additional documents were added to the room. Scanlan, however, testified that CRSS produced those documents in the "last days."

CRSS did not offer any explanation for the late addition of documents to the document room.[17] The trial court did not abuse its

---

**16.** See n. 4, *supra.* The subpoena duces tecum asked for production of all such documents under CRSS's control, whether or not they were in the custody and control of Sykes himself. No similar request was included in the subpoena duces tecum for Forrestier's deposition.

**17.** One possible reason for CRSS's failure to produce witnesses to testify about the addition of documents, is that CRSS did not know about the allegation until the hearing started. This is, of course, the reason the Harris County Local Rules require ten days notice. Harris County Local Rule 3.3.2.

discretion when it concluded that CRSS had produced documents late.

This ground was not included in the motion for sanctions. Nothing in Montanari's motion mentioned the late additions to the document room. CRSS had no notice before the hearing that it was required to defend itself against the allegations that it had added documents in the document room.

The trial court was not authorized to strike pleadings without a motion that alleged specific improper discovery abuse. Lack of such a motion deprived CRSS of notice of Montanari's allegations of improper conduct, and an opportunity to respond. The trial court violated Harris County Local Rule 3.3.2 by imposing sanctions on CRSS with less than 10 days notice of the oral grounds for sanctions. When a motion for sanctions asks the court to impose the ultimate sanction of dismissal or default, the defending party has a right to the full 10–days notice of the hearing.

■■■ We hold, however, that CRSS did not preserve the error regarding lack of adequate notice of the complaint and failure to provide 10 days before the hearing. In its response to the supplemental motion for sanctions, CRSS did not complain of inadequate notice of the hearing. At the hearing, CRSS did not complain that the court considered matters not contained in the supplemental motion. In the motion for leave to file an application for writ of mandamus filed in April 1992 in this Court (which we denied), CRSS did not complain of the failure to grant 10 days notice of the hearing or of considering complaints at the hearing that were not contained in the motion. In the brief filed in this Court, CRSS complains for the first time of lack of notice. That complaint is too late. Tex.R.App.P. 52(a); *Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex.1982).

■■■ We must now consider whether the sanction of default was an appropriate sanction for the late addition of documents to the document room. Although punishment, deterrence, and securing compliance with the discovery rules are valid reasons to impose sanctions, discovery sanctions must also be "just" under the express terms of rule 215. *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844,

849 (Tex.1992). To meet that standard, sanctions must meet the following requirements: (1) the sanction must bear a direct relationship to the offensive conduct; (2) the sanction must not be excessive; (3) the trial court must impose a less stringent sanction before imposing death penalty sanctions, to determine whether a lesser sanction will fully promote compliance and deterrence, and discourage further abuse; and (4) the trial court should not impose death penalty sanctions, denying a trial on the merits, unless the trial court finds that the sanctioned party's conduct "justifies a presumption that its claims or defenses lack merit" and that "it would be unjust to permit the party to present the substance of that position [which is the subject of the withheld discovery] before the court." *Id.* at 849–850; *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917, 918 (Tex.1991); *Braden v. Downey*, 811 S.W.2d 922, 929 (Tex.1991). In exceptional cases, a trial court may impose case determinative sanctions in the first instance, but only where they are clearly justified and it is fully apparent that no lesser sanctions would promote compliance with the rules governing conduct of discovery. *GTE Communications Sys. Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex.1993). A trial court's unsupported conclusion that lesser sanctions would not be effective does not support sanctions that terminate the lawsuit. *Id.*

■■■ In this instance, the sanction imposed was deficient as measured against the standards in *TransAmerican*, *Braden*, *Chrysler*, and *Tanner*.

■■■ Although Judge Lloyd warned in his June 8, 1991, order that CRSS's pleadings might be stricken in the future, neither Judge Lloyd nor Judge Chambers had actually imposed lesser sanctions before Judge Chambers struck CRSS's pleadings, despite five previous requests by Montanari for sanctions. Threatened, prospective, potential, or conditional sanctions do not constitute the *imposition* of a lesser sanction. *See Chrysler*, 841 S.W.2d at 850 ("conditional" sanctions were not an imposition of a required lesser sanction). Nor does an order to compel under rule 215(b)(1) qualify as a "lesser sanction." *Bair*, 838 S.W.2d at 681. Here,

the trial court recited in its order striking CRSS's pleadings that CRSS had "repeatedly failed to comply with this court's orders regarding discovery and production of documents." The record shows only one instance, before Judge Chambers struck CRSS's pleadings, in which either Judge Chambers or Judge Lloyd had found that CRSS engaged in sanctionable conduct—namely, the June 8, 1991, order in which Judge Lloyd found that CRSS had refused to comply with the court's July 2, 1990, "order relative to conducting depositions in Saudi Arabia." In that instance, the *threat* of sanctions was effective to secure CRSS' substantial compliance: the record shows that the parties cooperated sufficiently that they were able to arrange and undertake to conduct depositions in Saudi Arabia from July 26, 1991 through August 5, 1991 on a continuous and orderly basis on consecutive days during that period; and that the parties later arranged, evidently by mutual agreement, for most or all of those depositions to be taken at locations within the United States; and that at least 25 witnesses were ultimately deposed.[18] Although the trial court found that lesser sanctions would not have been effective, like the trial court in *Tanner,* it offered no explanation or rationale for that conclusion. Neither the trial court's unsupported conclusion, nor any other circumstance apparent in the record, supports sanctions that terminate the lawsuit.

We sustain point of error one.

18. This case is distinct from *Andras v. Memorial Hosp. Sys.,* 888 S.W.2d 567 (Tex.App.—Houston [1st Dist.] 1994, writ requested). There, the trial court granted the hospital's motion to compel, and ordered production of the requested information; then, when plaintiffs failed to comply, the court granted a second motion to compel production of that information; and, finally, the court ordered plaintiffs *to comply with its previous orders and warned that it would strike their pleadings if plaintiffs failed to comply. 888 S.W.2d at 570. After the trial court in *Andras* made good upon that threat, upon the appeal that followed, this Court affirmed, and held that an order to compel joined with a statement that noncompliance would result in dismissal does constitute the imposition of a lesser sanction within the meaning of *Chrysler.* 888 S.W.2d at 572–73.

In light of our disposition of point of error one, we do not reach CRSS's remaining points of error.

We reverse the judgment of the trial court and remand the cause for further proceedings consistent with this opinion.

COHEN, HUTSON–DUNN, MIRABAL, O'CONNOR, WILSON, HEDGES, ANDELL, and TAFT, JJ., voted against en banc consideration.

OLIVER–PARROTT, C.J., voted for en banc consideration and dissents from the denial of en banc consideration, with opinion to follow.

Here, the only sanctionable conduct that was potentially capable of supporting death penalty sanctions was CRSS's late addition of documents to the document room. Unlike in *Andras,* however, the trial court did not, before its order striking CRSS's pleadings, couple an order demanding production of those documents with a threat to strike CRSS's pleadings for failure to comply; and unlike the *Andras* plaintiffs, CRSS did not obdurately refuse to provide discovery, in the face of such a demand and threat. On our reading of *Andras,* the demand and threat must relate to the same act; and as we have described in the text, here the trial court's only threat to strike CRSS's pleadings was addressed solely to *other* sanctionable conduct, which formed no part of the basis for striking CRSS's pleadings. *Andras* is, accordingly, inapposite.